**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHRISTOPHER GALLAGHER,

      Petitioner,

v.                                  Case No. 3:22-cv-1031-TJC-MCR

CONSILIO, LLC,

      Respondent.

_____

## O R D E R

This employment contract noncompete case is before the Court on questions of arbitrability and the Court's injunctive power. Petitioner Christopher Gallagher asks the Court to enjoin arbitration proceedings brought by Respondent Consilio, LLC, the purported successor in interest to Gallagher's old employer. (Doc. 4 ¶¶ 14, 21, 24). Gallagher also seeks a declaratory judgment that the employment contract dispute is non-arbitrable. Id. ¶ 34.

Litigation began on August 17, 2022, when Consilio filed a demand for arbitration with the American Arbitration Association claiming that Gallagher had breached his employment contract's noncompete clause. (Doc. 5-2). Gallagher responded on September 9, 2022, in state court with a petition to stay arbitration. (Doc. 1-1). On September 20, 2022, Gallagher moved for a preliminary injunction (Doc. 5) and on September 22, 2022, Consilio removed

the case to federal court. (Doc. 1). At a telephone status conference on October 3, 2022, the parties agreed to pause the arbitration proceedings, mooting Gallagher's request for a preliminary injunction. <u>See</u> (Doc. 19). The parties have since briefed whether this dispute belongs in court or in arbitration. (Docs. 20, 21, 22, 23). At the Court's direction, the parties supplementally briefed whether federal or state arbitration law applies to this matter and whether the Court is empowered to enjoin the arbitration proceedings. <u>See</u> (Docs. 24–26).

## I.      BACKGROUND

In 2017, Gallagher signed an employment agreement. (Doc. 21-1 at 7–14). The agreement, countersigned by "Laurie Chamberlin, President," lays out several provisions, including an arbitration provision and detailed noncompete and non-solicitation covenants extending twelve months after Gallagher's employment should end. <u>See</u> <u>id.</u> In place of naming Gallagher's employer, the agreement instead read "[INSERT COMPANY]." <u>Id.</u> at 7. Although there were clues to the company's identity—such as language implying that the unnamed company was somehow affiliated with "the Adecco Group" [1] —the 2017

---

[1] The exact identity of the Adecco Group is unclear from the record. Consilio's president declares that Consilio purchased assets from the Adecco Group in 2021. (Doc. 21-1 at 2–3). The Purchase and Sale Agreement he cites lists "Adecco, Inc." as an "indirect parent" of other asset sellers. <u>Id.</u> at 26. Taken together, these statements suggest that the Adecco Group could be a trade name for Adecco, Inc., but do not resolve the question.

agreement never explicitly identified Gallagher's immediate employer. See id. at 7–8.

Fast forward to 2021, Gallagher signed a new agreement—countersigned by Sergio Picarelli and Laurie Chamberlin—this time clearly with "Adecco Group, and its affiliates or subsidiaries." Id. at 16–20. This May 14, 2021 agreement, the "Project Profectus Special Transaction Terms" letter ("incentive agreement"), entitled Gallagher to "a special transaction bonus" and other benefits upon a change in company ownership so long as he did not quit, get fired for cause, or compete against the company (among other things) for twelve months after signing the agreement. See id. In other words, the agreement encouraged Gallagher to remain through an upcoming sale.

That sale, according to Consilio's president, was Consilio's asset purchase of Gallagher's employer: ADO Professional Solutions, Inc.—doing business as Special Counsel and a part of the Adecco Group. Id. at 2–3. According to Consilio's president, Gallagher's 2017 employment agreement, including the noncompete and non-solicitation covenants, was assigned to Consilio during the sale. Id. at 3. After leaving the now-absorbed Special Counsel and turning down a new job with Consilio, Gallagher reportedly joined a competitor company and began poaching former Special Counsel employees from Consilio. Id. at 3–4. Consilio thus sought to enforce the noncompete and non-solicitation clauses of the 2017 employment agreement through arbitration. See (Doc. 5-2).

3

Gallagher now challenges arbitration on two grounds. First, he argues that Consilio lacks standing to enforce the arbitration clause in his 2017 employment agreement because Consilio cannot prove who Gallagher's 2017 employer was. (Doc. 20 at 3). Without identifying the employer from his 2017 agreement, Consilio cannot show that this original employer transferred the agreement—along with its restrictive covenants—to Consilio. Id. at 8–11. Second, even if Consilio could enforce the 2017 employment agreement, Gallagher argues that the 2021 incentive agreement—which contains no arbitration clause—supersedes the 2017 agreement and takes arbitration off the table. Id. at 11–13. Gallagher thus asks the Court to permanently enjoin arbitration and to declare that the employment dispute is not arbitrable. (Doc. 4 at 8). Consilio argues that the Court cannot grant the requested injunctive relief, argues that the arbitrator, not the Court, should determine whether the dispute is arbitrable, and disputes Gallagher's challenges to arbitrability. (Docs. 21, 23, 26).

## II.   INJUNCTIVE RELIEF

In Count I of his petition, Gallagher seeks to stay the arbitration proceedings initiated by Consilio. (Doc. 4 ¶¶ 24, 32). Gallagher argues that the Court is empowered to enjoin the arbitration for two reasons. First, he argues that this case satisfies the standard for a traditional injunction. (Doc. 25 at 3–5). And second, even if that fails, he argues that the Federal Arbitration Act

("FAA") itself grants courts the statutory power to enjoin arbitration. Id. at 5–6.

### A.    Traditional injunctive relief is not available

A court may issue a traditional injunction if a party can demonstrate:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004) (quoting Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam)). Temporary and permanent traditional injunctions share the same standard, though permanent injunctions require "actual success on the merits instead of a likelihood of success." Id. (quoting Siegel, 234 F.3d at 1213). Courts have found that actions to enjoin arbitration proceedings fail both the first and second traditional injunction elements.

Beginning with the first, success on the merits, the Eleventh Circuit in Klay explained that "any motion or suit for a traditional injunction must be predicated upon a cause of action." Id. at 1097. There being "no such thing as a suit for a traditional injunction in the abstract," the court stressed that "a plaintiff [must] make a showing that some independent legal right is being infringed." Id. at 1097–98. "'Wrongful arbitration,' however, is not a cause of

action for which a party may sue." Id. at 1098. And if "wrongful arbitration" is not a cause of action, a plaintiff cannot "succeed" on its merits. See id. at 1098, 1112.

Gallagher argues that his request for an injunction is distinguishable because he also seeks a declaratory judgment that the employment dispute is not arbitrable. (Doc. 25 at 4). Because his request for injunctive relief is not "freestanding" but is rather tied to his request for declaratory relief, Gallagher explains, he can still achieve success on the merits. Id. Some courts have suggested that Gallagher's argument may have merit. See Pictet Overseas Inc. v. Helvetia Tr., 905 F.3d 1183, 1186–87 (11th Cir. 2018) (implying that a declaratory judgment of non-arbitrability could constitute success on the merits to enjoin Financial Industry Regulatory Authority ("FINRA") arbitration); Matthews v. Aviation Performance Sols., LLC, No. 21-80857-CV, 2022 WL 17988153, at *4 (S.D. Fla. Feb. 11, 2022) (suggesting that "an action seeking a declaratory judgment" could be an "underlying cause of action for which injunctive relief is sought as a remedy").

That said, Gallagher cannot show the second element—irreparable injury. In Klay, the Eleventh Circuit explained that "[i]f a dispute is nonarbitrable, then an arbitrator necessarily exceeds his powers in adjudicating it." 376 F.3d at 1112 n.20. But if an arbitrator acts beyond the authority granted by the parties' contract, "the result is a legal nullity." Id. at

1095 n.2. If the arbitrator lacks jurisdiction, Gallagher "would not have to participate in [Consilio's] arbitration proceedings," nor could a district court enforce the award. Id. at 1112 n.20 (citing 9 U.S.C. § 10(a)(4)). Although refusal to participate in invalid arbitration proceedings could theoretically cause irreparable harm in the right scenario, Gallagher has not made this showing. See Intamin Amusements Rides Int. Corp. Est. v. US Thrillrides, LLC, No. 6:20-cv-713-Orl-41DCI, 2020 WL 5534464, at *4 (M.D. Fla. Aug. 26, 2020) (distinguishing ordinary arbitration from FINRA arbitration, where members can lose their membership if they refuse to participate); Klay, 376 F.3d at 1112 n.20 (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.")). Gallagher cannot show a likelihood of irreparable harm, so traditional injunctive relief is unavailable.

**B.    Statutory injunctive relief is not available**

Gallagher alternatively argues that the FAA (or Florida's equivalent) statutorily authorizes courts to enjoin arbitration proceedings. (Doc. 25 at 5–6). "A statutory injunction is available where a statute bans certain conduct or establishes certain rights, then specifies that a court may grant an injunction to enforce the statute." Klay, 376 F.3d at 1098. Klay did not decide whether the

7

FAA authorizes injunctions. See id. at 1099.[2] But at least one court applying Klay has found that neither section 3 nor section 4 of the FAA explicitly or implicitly authorizes injunctions.[3] Matthews, 2022 WL 17988153, at *5–6.

Gallagher does not rely on 9 U.S.C. §§ 3 and 4. Instead, he relies on § 16, which describes the circumstances governing appeals from various types of orders. (Doc. 25 at 5). Section 16(a)(2) provides a right to appeal "an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title." Conversely, § 16(b) prevents appeals of interlocutory orders "refusing to enjoin an arbitration that is subject to this title." By specifying parameters for appealing orders enjoining arbitration, Gallagher argues, the FAA "specifically contemplates and provides a statutory basis for injunctions against arbitration." (Doc. 25 at 5). Although § 16 gives the Court some pause, it is not enough to authorize a statutory injunction.

When a statute confers injunctive power, "the standards for granting statutorily-authorized injunctions are necessarily controlled by the statute

---

[2] The parties in Klay did not argue that the FAA statutorily authorizes injunctions. Klay, 376 F.3d at 1099. Even so, the court noted in dicta that section 4 of the FAA "permits a federal court to compel arbitration based on an arbitration clause in a written contract, but does not permit a court to enjoin arbitration based on an issue's nonarbitrability." Id. at 1099 n.8.

[3] Section 3 of the FAA governs stays of district court proceedings while arbitration is ongoing. 9 U.S.C. § 3. Section 4 governs disputes about arbitrability and a district court's ability to compel arbitration. Id. § 4.

itself." <u>Klay</u>, 376 F.3d at 1098. No part of the FAA explicitly authorizes courts to enjoin arbitration, nor does the FAA offer any standards or guidelines for enjoining arbitration. Although § 16 shows that interlocutory orders "granting, continuing, or modifying an arbitration" may be appealed, it does not follow that the FAA itself, rather than some other source, authorizes these injunction orders. § 16(a)(2); <u>cf.</u> <u>Intamin Amusements Rides</u>, 2020 WL 5534464, at *4 (theorizing that traditional injunctions could enjoin arbitration under the right circumstances). Thus, a plain reading of the FAA does not suggest that Congress gave courts the statutory power to enjoin arbitration.

Finally, even assuming the Court could grant a statutory injunction, Gallagher would not qualify. "[T]he Eleventh Circuit has suggested that the previously-described four factors required for the issuance of a traditional injunction must be met <u>in addition</u> to any statutory requirements for the issuance of a statutory injunction." <u>Matthews</u>, 2022 WL 17988153, at *6 (citing <u>Klay</u>, 376 F.3d at 1098–99). As discussed, Gallagher cannot show irreparable harm. <u>See</u> <u>supra</u>, Section II.A. Having no statutory or traditional basis to grant Gallagher's requested injunction, the Court will dismiss Count I.[4]

---

[4] Although agreeing that the FAA, not the Revised Florida Arbitration Code ("RFAC"), generally controls this matter, Gallagher suggests in a footnote that the Court can enjoin the arbitration proceedings under the RFAC. (Doc. 25 at 2–3, 6 n.2) (invoking FLA. STAT. § 682.03). Florida's arbitration code, prior to 2013, explicitly authorized courts to enjoin arbitration, but the current, revised version removed this authorization. <u>See</u> <u>Matthews</u>, 2022 WL 17988153, at *7

## III.   ARBITRABILITY

Even without an injunction, Gallagher still asks the Court for a declaratory judgment that "that the disputes between Mr. Gallagher and Consilio are not arbitrable as there is no valid and enforceable arbitration agreement between the parties." (Doc. 4 ¶ 34). For the following reasons, the Court will permit discovery and set this matter for trial.

### A.   The Court should determine arbitrability

There are "three distinct types of challenges to a contract containing an arbitration clause: (1) a challenge to the validity of the arbitration clause standing alone, (2) a challenge to the validity of the contract as a whole, and (3) a challenge to the very existence of the contract." Wiand v. Schneiderman, 778 F.3d 917, 924 (11th Cir. 2015) (citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444–45 n.1 (2006)). By default, "[c]hallenges to the validity of the contract as a whole are for the arbitrator to decide, whereas challenges to the validity of the arbitration clause in particular or to the very existence of the contract must be resolved by the court before deciding a motion to compel arbitration." Id. The parties disagree on what kind of challenge Gallagher makes.

---

n.8 (holding that FLA. STAT. § 682.03 does not authorize injunctions to stay arbitration). So even if the RFAC does apply, it does not help Gallagher.

Gallagher's primary argument against arbitration is that "Consilio is not a party" to the 2017 employment agreement and cannot show that the agreement was ever assigned to Consilio. (Doc. 20 at 8–9). Since the employment agreement does not name Gallagher's employer and Gallagher testifies that he did not work for any of the companies Consilio purchased, Gallagher argues that Consilio cannot enforce the agreement. Id. at 9–11. Consilio argues that this attack on arbitrability is really an attack on the validity of the entire employment agreement—a dispute for the arbitrator. (Doc. 21 at 8–12).

Although Gallagher's attack on arbitrability implicates the entire employment agreement, he attacks the contract's existence, not its validity. Contract formation in Florida requires "offer, acceptance, consideration, and sufficient specification of essential terms." CEFCO v. Odom, 278 So. 3d 347, 352 (Fla. 1st DCA 2019). One essential term to a contract is the identity of the parties. See David v. Richman, 568 So. 2d 922, 924 (Fla. 1990) (characterizing the names of the parties in a contract as "material terms"); Babul v. Golden Fuel, Inc., 990 So. 2d 680, 683–84 (Fla. 2d DCA 2008) (requiring parol evidence to determine the identity of the contracting parties). So an attack on the identity of the parties goes to contract existence, not the enforceability of a presumptively valid contract. See Buckeye Check Cashing, Inc., 546 U.S. at 444–45 n.1 (distinguishing between a contract's validity and a contract's

11

existence). Questions about whether Gallagher and Consilio's assignor ever formed a contract belong before the Court. See Wiand, 778 F.3d at 924.

### B.   The 2017 employment agreement requires parol evidence

All that said, the Court needs more evidence before ruling on Gallagher's petition. A valid and enforceable contract may be formed even if the identity of the parties is ambiguous. Florida law "allow[s] parol evidence regarding identity, capacity, and the parties' relationship with one another" even when the identity of the parties is ambiguous "on the face of the document." Fi-Evergreen Woods, LLC v. Robinson, 135 So. 3d 331, 336 (Fla. 3d DCA 2013) (citing Landis v. Mears, 329 So. 2d 323, 326 (Fla. 2d DCA 1976)). Although the parties attach affidavits and exhibits to their briefing, the record is inconclusive.

Consilio attempts to show that the employer behind the 2017 employment agreement is ADO Professional Solutions, Inc., which purportedly does business as Special Counsel. (Doc. 21 at 13–15). In support, Consilio provides copies of Laurie Chamberlin and Gallagher's social media profiles, both of which suggest they were employees of Special Counsel in 2017. Id.; (Doc. 21-1 at 43–56). Consilio also notes the 2017 employment agreement's frequent references to the Adecco Group, which Consilio states was ADO's parent company. (Doc. 21 at 14–15). Even if the Court credits Consilio's evidence, it is challenged by Gallagher's declaration that he was not employed by any of the

companies Consilio purchased, which includes ADO Professional Solutions, Inc. (Doc. 5-1 ¶ 7); <u>see</u> (Doc. 21-1 at 26) (Consilio's Purchase and Sale Agreement, identifying ADO Professional Solutions, Inc., as one of the sellers). Gallagher also provides evidence suggesting that Laurie Chamberlin was not the president of Special Counsel when she signed the 2017 employment agreement as "Laurie Chamberlin, President." <u>See</u> (Doc. 21-1 at 14); (Doc. 22 at 8); (Doc. 22-1 at 5). This factual dispute needs to be resolved at trial. <u>See</u> <u>Babul</u>, 990 So. 2d at 684 (ambiguity in the contract paired with conflicting affidavits required resolution by trial).

**C.    The 2021 incentive agreement requires parol evidence**

Even if the 2017 employment agreement were validly formed and assigned to Consilio, Gallagher alternatively argues that it was superseded by the 2021 incentive agreement. (Doc. 20 at 11–13). The incentive agreement does not have an arbitration clause. So if the incentive agreement extinguished the 2017 employment agreement, Gallagher explains, there is no longer a basis for arbitration. Gallagher thus opposes any further discovery, arguing that the plain language of the incentive agreement proves his argument against arbitrability. (Doc. 22 at 11). This argument falls short.

"[W]hen a subsequent agreement entirely supersedes an earlier agreement, the <u>existence</u> of a validly formed and enforceable arbitration agreement is called into question." <u>Reiterman v. Abid</u>, 26 F.4th 1226, 1232 (11th

Cir. 2022) (internal quotation marks omitted) (quoting <u>Dasher v. RBC Bank (USA)</u>, 745 F.3d 1111, 1120 (11th Cir. 2014)). So any challenges to arbitrability based on the novation of a prior agreement must be resolved by the Court, not an arbitrator. <u>See</u> <u>id.</u> at 1233.

Under Florida law, a subsequent contract can supersede and replace an earlier one through novation. "A novation may occur where there is a mutual agreement between the parties to discharge a valid existing obligation by the substitution of a new valid obligation." <u>De Las Cuevas v. Nat'l Enterprises Inc.</u>, 927 So. 2d 41, 44 (Fla. 3d DCA 2006). "Whether a novation takes place depends upon the intent of the parties." <u>Id.</u> "To determine the intent of the parties, a court should consider the language in the contract, the subject matter of the contract, and the object and purpose of the contract." <u>MDS (Canada) Inc. v. Rad Source Techs., Inc.</u>, 143 So. 3d 881, 891 (Fla. 2014) (quoting <u>Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.</u>, 593 So. 2d 195, 197 (Fla. 1992)). A subsequent contract will not subsume and replace an original contract if "the new contract embraces a different subject matter without fully covering the terms of the original." <u>Franz Tractor Co. v. J.I. Case Co.</u>, 566 So. 2d 524, 525 (Fla. 2d DCA 1990). And finally, "a dispute as to the intent of the parties" is "a question of fact for the trier of fact." <u>De Las Cuevas</u>, 927 So. 2d at 44.

The 2017 employment agreement and 2021 incentive agreement share some similarities. Both involve Gallagher's employment, both contain

14

noncompete and confidentiality clauses, and both are signed by Laurie Chamberlin. <u>See</u> (Doc. 21-1 at 7–14, 16–20). But there are differences, too. The 2017 employment agreement broadly describes the parameters of Gallagher's at-will employment, and it is in this day-to-day context that the 2017 employment agreement describes his detailed obligations of loyalty and confidentiality. <u>See</u> <u>id.</u> at 7–14. The 2021 incentive agreement, on the other hand, targets a singular event: an "opportunity from Adecco Group . . . in connection with the successful completion of a potential transaction." <u>Id.</u> at 16. This event contextualizes the incentive agreement's parallel covenants and restrictions. For example, the incentive agreement conditions payments on Gallagher not poaching Adecco Group employees within a year of his termination "in the event of a change of control of the company" and requires that "Project Profectus and the existence of this letter and terms herein shall be maintained as confidential." <u>Id.</u> at 19–20. So while the two agreements are similar, they arguably have different subjects.

Given the possibly different subject matter between the two agreements—general employment obligations versus obligations and incentives for a specific upcoming transaction—it is not clear whether the incentive agreement was intended to replace or supplement the 2017 employment

agreement.[5] The intent behind the 2021 incentive agreement is thus an issue of fact to be resolved at trial. See De Las Cuevas, 927 So. 2d at 44.

Accordingly, it is hereby

**ORDERED:**

1.      Count I of Gallagher's Petition (Doc. 4) is **DISMISSED with prejudice**. To the extent the Court's October 6, 2022 Order (Doc. 19) purports to restrict the arbitration proceedings, all such restrictions are lifted.

2.      Consilio shall answer Count II of the Petition no later than **September 1, 2023.**

3.      The Parties shall jointly file a case management report (the form is on the Court's website) no later than **September 1, 2023**.

**DONE AND ORDERED** in Jacksonville, Florida the 9th day of August, 2023.



TIMOTHY J. CORRIGAN
United States District Judge

rmv
Copies to: Counsel of record

---

[5] The incentive agreement's merger clause stating that it "supersedes all prior agreements and understandings between the parties" is similarly inconclusive. (Doc. 20 at 13–14); (Doc. 21-1 at 20). The merger clause's language "prior agreements and understandings" is modified by the prior phrase "with respect to the subject matter hereof." (Doc. 21-1 at 20). So Gallagher must still show that the 2017 employment agreement and the incentive agreement have the same subject matter for the merger clause to apply.